**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

GEORGE D. MILANES,

      Plaintiff,

vs.

EXPERIAN INFORMATION
SOLUTIONS, INC. AND AFFIRM, INC.,

      Defendants.

Case No.: 8:24-cv-1040

**JURY TRIAL DEMANDED**

## COMPLAINT

George D. Milanes ("Plaintiff" or "Mr. Milanes") brings this action on an individual basis, against Experian Information Solutions, Inc. (""Experian") and Affirm, Inc. ("Affirm") for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et. seq.*, arising out of Defendants' mixing Plaintiff's credit file with another consumer.

## INTRODUCTION

1.    The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal

Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.     However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendant Experian acknowledges this potential for misuse and resulting damage every time it sells its credit monitoring services to a consumer.

3.     The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.     These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

7.      Congress made the following findings when it enacted the FCRA in 1970:

(a)     The banking system is dependent upon fair and accurate credit reporting.  Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

(b)     An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

(c)     Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

(d)     There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

8.      Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter."   15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9.      The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

4

10.     Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 *et. seq.*, ("FCRA"), the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

11.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

12.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

13.     The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to

conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

14.     A recurring and *known* issue within the credit reporting industry is the creation of "mixed files."

15.     A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

16.     "Mixed files" create a false description and representation of a consumer's credit history.

17.     The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

18.     Mixed files are not a new phenomenon. Defendant Experian has been on notice of the existence of mixed files, and the fact that its procedures for creating credit files, including its matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

19.     More recently, Defendant Experian has been the subject of numerous state attorney general actions relating to its mixed file problem.

20.     For example, in 2015, the New York Attorney General filed charges and settled claims with Defendant Experian over mixed files.[1]  *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

21.     Notwithstanding Defendant Experian's notice and being subject to repeated enforcement actions, mixed files continue to occur despite consumers' unique personal identifying information, such as Social Security numbers, date of birth, and addresses.

22.     Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both.  This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers applies for credit, housing, insurance, or employment, and Defendant Experian sells information pertaining to one consumer in response to the application of the other.

---

[1] https://ag.ny.gov/press-release/2015-ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three Last visited May 17, 2022; *see also* https://ag-ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf Last visited May 17, 2022.

23.    Defendant Experian has been sued thousands of times wherein an allegation was made that Defendant Experian violated the FCRA.   Moreover, Defendant Experian is sued, at a minimum, hundreds of times each year wherein an allegation is made that Defendant Experian mixed a consumer's credit file with that of another consumer.

24.    FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

25.    For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes.  The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages.   Despite the verdict, Defendant Experian continues to mix consumers' credit files with other consumers' credit files.

26.    In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes.

Despite the verdict, Defendant Experian continues to mix consumers' credit files with other consumers' credit files.

27.    In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes.  Despite the verdict, Defendant Experian continues to mix consumers' credit files with other consumers' credit files.

28.    More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone.  *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom. Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 20020).  Despite the verdict, Defendant Experian continues to mix consumers' credit files with other consumers' credit files.

29.    "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's

disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

30.    No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

31.    Notably, the Federal Trade Commission has specifically warned consumer reporting agencies, including Experian, to review their procedures when a mixed file occurs.

32.    Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

33.    Plaintiff's claims arise out of the Defendant Experian's blatantly inaccurate credit reporting, wherein Defendant Experian published in a consumer report about Plaintiff the information of another consumer because Defendant Experian mixed Plaintiff's credit file with that of an unrelated consumer.

34.     Accordingly, Plaintiff brings claims against Defendant Experian for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiff's credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

35.     Plaintiff also brings a claim against Defendant Affirm for failing to fully and properly reinvestigate Plaintiff's disputes and review all relevant information provided by Plaintiff and the Credit Bureau Defendant Experian, in violation of the FCRA, 15 U.S.C. § 1681s-2(b)(1).

36.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

37.     George D. Milanes ("Plaintiff" or "Mr. Milanes") is a natural person residing in Wimauma, Florida, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

38.     Defendant Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") is a corporation with a principal place of business located at 475 Anton Boulevard, Costa Mesa, California 92626, and is authorized to do business in the State of Florida, including within this District. Experian can be served at its registered agent address at CT Corporation System, 330 N. Brand Blvd, Glendale, CA 91203

39.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

40.     Defendant Affirm, Inc. ("Affirm") is an American public company with a principal place of business located at 650 California Street, FL 12, San Francisco, CA 94108 and is authorized to do business in the State of Florida, including within this District.  Defendant Affirm may be served through its Florida registered agent, c/o CT Corporation, located at 1200 South Pine Island Rd., Plantation, FL 33324.

41.     Affirm, Inc. is a credit grantor and "furnisher" of consumer information, as defined in 15 U.S.C. § 1681s-2(b).

## JURISDICTION AND VENUE

42.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C.

§ 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought

in any appropriate court of competent jurisdiction.

43.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2)

because a substantial part of the events or omissions giving rise to Plaintiff's claims

occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

44.     The FCRA governs the conduct of consumer reporting agencies in an

effort to preserve the integrity of the consumer banking system and to protect the

rights of consumers to fairness and accuracy in the reporting of their credit

information.

45.     The FCRA was designed to protect consumers from the harmful effects

of inaccurate information reported in consumer reports (commonly referred to as

"credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit

reporting" and the "need to ensure that consumer reporting agencies exercise their

grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15

U.S.C. § 1681(a).

46.    Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information.  *See* 15 U.S.C. § 1681(b).

47.    To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

48.    The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

### Defendant Experian's Processing of Credit Information

49.    Defendant Experian regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

50.     These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

51.     Defendant Experian collects information from thousands of furnishers.

52.     The process by which Defendant Experian receives, sorts, and stores information is largely electronic.

53.     Furnishers report credit information to Defendant Experian through the use of coded tapes that are transmitted to Defendant Experian on a monthly basis through software known as Metro 2.

54.     Defendant Experian takes credit information reported by furnishers and creates consumer credit files.

55.     Defendant Experian maintains credit files on more than 200 million consumers.

56.     Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

**Defendant Experian's Mixed File Problem**

57.     Defendant Experian knows that different consumers have similar names.

58.     Defendant Experian knows that different consumers can have similar Social Security numbers.

59.     Defendant Experian knowns that different consumers with similar names can also have similar Social Security numbers.

60.     Defendant Experian knows that public records often do contain identifying information such as Social Security numbers or dates of birth.

61.     Defendant Experian matches tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

62.     Defendant Experian accomplishes this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

63.     From time to time, Defendant Experian's matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what's commonly known as in the credit reporting industry as a mixed or merged credit file.

64.     Mixed files are not a new phenomenon.  In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged

with enforcement of the FCRA), entered into individual Consent Decrees with each of the major CRAs, specifically including Defendant Experian, regarding its significant failures and deficiencies with respect to mixed files.

65.     Despite Defendant Experian's long-standing and specific knowledge of the mixed file problem, Plaintiff's credit report was still generated by Defendant Experian containing information belonging to another consumer.

66.     A mixed or merged credit file is the result of Defendant Experian's inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

67.     There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms and/or database rules used by Defendant Experian to match personal identifying information and credit information, including public record information, to a particular consumers' credit file.

68.     The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to Defendant Experian.

69.   A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to Defendant Experian.

70.   Accordingly, the database rules determine which credit files are selected by the algorithm and merged to create a complete consumer report.

71.   Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

## Plaintiff Applies for Financing for a New Truck

72.   On or about November 16, 2023, Plaintiff went to Courtesy Chrysler to trade in his truck and purchase a new one.  Plaintiff's current truck was no longer under warranty and was starting to have minor issues.  Plaintiff wanted to trade in his current truck while it was still had value and purchase a new truck that would be under warranty.

73.   On or about November 16, 2023, Plaintiff submitted a credit application at the Chrysler dealership for the new truck.

74.   For Courtesy Chrysler to make a determination on Plaintiff's credit application, it would need to obtain copies of his credit files.  Plaintiff provided

Courtesy Chrysler with his personal identification information, including his Social Security number, and authorized it to obtain copies of his credit files.

75.   On or about November 16, 2023, Defendant Experian sold a credit report about Plaintiff to Courtesy Chrysler in response to Plaintiff's credit application for the new truck.

### Courtesy Chrysler Offers Plaintiff a Loan with High Interest Rate

76.   On or about November 16, 2023, Plaintiff was approved for financing at the Courtesy Chrysler dealership, but at a higher interest rate.

77.   Plaintiff asked why he was approved at such a high interest rate and the representative at the dealership explained it was because he had derogatory information on his credit report.

78.   Plaintiff was shocked and dismayed at the allegation that he had derogatory information on his credit report as he had never had a late payment.

### Plaintiff Obtains a Copy of his Credit Reports

79.   Shortly after Courtesy Chrysler informed Plaintiff about the derogatory information on his credit, Plaintiff reviewed his credit reports with Defendant Experian and non-parties Trans Union and Equifax.

80.   Upon review, Plaintiff was shocked to learn that Defendant Experian was reporting information that did not belong to him.

81.    Upon reviewing the contents of his credit file with Defendant Experian, Plaintiff was confused by the appearance of several pieces of information that did not belong to him.

82.    Specifically, Defendant Experian was reporting the following account that did not belong to Plaintiff:

> Affirm Account
> Account Number: OYRAXXXX
> Date Opened: February 7, 2022
> Account Past Due, Sent to Collections, Written Off with a Balance of $391.

83.    Further, Defendant was reporting the following addresses that did not belong to Plaintiff:

    a.    1540 Thieriot Ave, BSMT, Bronx, NY 10460-3404

    b.    2400 Adam Clayton Powell Jr., Blvd., New York, NY 10030

84.    In addition, Defendant was reporting the following spouse name, Juan, that does not belong to Plaintiff.

85.    By reporting the aforementioned credit account and other personal information in the credit file presumably about Plaintiff, despite the fact that the account and information do not belong to Plaintiff, Defendant Experian failed to follow reasonable procedures to assure the maximum possible accuracy of the

information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

### Plaintiff's First Dispute to Defendant Experian

86.    In or about December 2023, worried that something was very wrong with his credit file, Plaintiff disputed the Affirm account and the other personal identifying information with Experian. Specifically, Plaintiff disputed the information that did not belong to him.

### Defendant Experian's Unreasonable Dispute Reinvestigation

87.    Upon information and belief, Defendant Experian sent Defendant Affirm an automated credit dispute verification ("ACDV") pursuant to Plaintiff's December 2023 dispute to Experian.

88.    Upon information and belief, Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff's disputes.

89.    In late December 2023, Defendant Experian responded to Plaintiff's dispute and refused to remove the Affirm account. The only information Defendant Experian corrected was the spouse name "Juan" and the New York address, 2400 Adam Clayton Powell Jr., Blvd., New York, NY 10030-1848.

//

**Plaintiff's Second Dispute to Defendant Experian**

90.     Shortly after receiving Defendant Experian's response to his first dispute, Plaintiff submitted a second dispute with Defendant Experian disputing the Affirm account and the New York address, 1540 Thieriot Ave, BSMT, Bronx, NY 10460-3404.

91.     In response to Plaintiff's second dispute, Defendant Experian continued to report the Affirm account and the 1540 Thieriot Ave, BSMT, Bronx, NY 10460-3404 address on his credit file.

92.     Defendant Experian failed to conduct a reasonable investigation of Plaintiff's December 2023 disputes, or any reinvestigation whatsoever, to determine whether the disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**The Credit Bureaus' Method for Considering Consumer Credit Report Disputes**

93.     The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

94.     The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by

consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

95.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

96.    It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

97.    Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

98.    Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

99.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

100.    These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

101.   Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

102.   The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

103.   Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**Defendant Affirm's Unreasonable Dispute Reinvestigation**

104.   Upon information and belief, in or about December 2023, Defendant Affirm received two separate ACDVs from Defendant Experian's and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

105.   Upon information and belief, Defendant Affirm failed to review all relevant information provided by Defendant Experian regarding Plaintiff's dispute tendered in or about December 2023.

106.   Upon information and belief, Defendant Affirm verified the disputed information as accurate to Defendant Experian in or about December 2023.

107.   Defendant Affirm violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete or unverifiable.

**Plaintiff's Third and Fourth Disputes to Defendant Experian**

108.   On or about February 2, 2024, Plaintiff obtained a copy of his Annual Credit Report from Defendant Experian and the following mixed information remained on his credit report:

      (a)    Affirm Account
                Account Number:  OYRAXXXX
                Date Opened: February 7, 2022
                Account Past Due, Sent to Collections, Written Off with a Balance of $391.

109.   Further, Defendant was reporting the following addresses which did not belong to Plaintiff:

      (a)    1540 Thieriot Ave, BSMT, Bronx, NY 10460-3404

110.   Upon information and belief, Defendant failed to unmix Plaintiff's credit file from that of the other consumer and likely Defendant continued to report the other consumer's information to Plaintiff's credit file.

111.   On February 12, 2024, Plaintiff disputed via certified mail to Defendant Experian.

112.   Along with his dispute letter, Plaintiff enclosed a copy of his driver's license and social security card to better assist Defendant Experian in identifying him in its system.

113.   Plaintiff requested that Defendant reinvestigate the disputed information, correct the reporting, and send him a corrected copy of his credit report.

114.   On Feb. 27, 2024, Plaintiff received a letter from Defendant Experian stating that they believed the dispute was not sent by Plaintiff.

115.   On March 7, 2024, Plaintiff mailed another dispute letter to Defendant Experian.

116.   In or around early April 2024, Plaintiff received a letter from Defendant Experian dated March 20, 2024, again stating Defendant Experian did not believe the dispute had come from Plaintiff.

117.   On or about April 3, 2024, Plaintiff called Defendant Experian and spoke with a representative named Kayla. Plaintiff explained that the previous

dispute letters had come from him. The representative told Plaintiff that they had noted their system that the letter came from him and that they were going to notify Defendant Affirm of Plaintiff's dispute.

118. Plaintiff received correspondence dated April 18, 2024, from Defendant Experian stating that Affirm had certified the disputed information as accurate.

119. As of the date of this filing, the information belonging to the unrelated consumer remains on Plaintiff's credit report.

120. Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

121. Upon information and belief, because Defendant Experian continues to mix Plaintiff's credit file with that of the unrelated consumer, Defendant Experian continues to sell Plaintiff's credit file in response to applications and inquiries pertaining to the unrelated consumer.

122. As a result of the "mixed file," Defendant Experian made it practically impossible for Plaintiff to obtain credit.

123.   Plaintiff has not tried to buy a new truck again because he knows that this inaccuracy will affect his interest rates and he does not want to pay higher interest rates.

124.   In addition to not being able to buy a new truck, Plaintiff delayed renovating his home, because he did not want to apply for financing while Defendant Experian continued to report and Defendant Affirm continued to furnish a derogatory account that did not belong to him. Plaintiff feared that the financing would be at a much higher interest rate then he would be comfortable paying.

125.   Plaintiff also wanted to limit the amount of hard inquires on his credit, which would adversely affect his credit.

126.   At all times pertinent hereto, Defendant Experian was acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant Experian herein.

127.   At all times pertinent hereto, Defendant Experian's conduct, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

128.   As a standard practice, Defendant Experian does not conduct independent investigations in response to consumer disputes.   Instead, it merely parrots the response of the credit furnisher, despite numerous court decisions admonishing this practice.  *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

129.   Defendant Experian is aware of the shortcomings of its procedures and intentionally chooses not to comply with the FCRA to lower its costs.  Accordingly, Defendant Experian's violations of the FCRA are willful.

130.   As a result of Defendant Experian's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information

about who was viewing his private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Defendant Experian)

131.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

132.   The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

133.   On at least one occasion, Defendant Experian prepared patently false consumer reports concerning Plaintiff.

134.   Defendant Experian mixed another consumer's personal and credit account information into Plaintiff's credit file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

135.   Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

136.   As a result of Defendant Experian's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money

disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

137.  Defendant Experian's conduct, actions, and inactions was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

138.  Plaintiff is entitled to recover attorneys' fees and costs from Defendant Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
## 15 U.S.C. § 1681i
### Failure to Perform a Reasonable Reinvestigation
### (Second Claim for Relief Against Defendant Experian)

139.  Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

140.  The FCRA mandates that Defendant Experian conduct a reasonable reinvestigation of the accuracy of information "[i]f the completeness or accuracy of

any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The FCRA imposes a 30-day time limit for the completion of such an investigation. *Id*.

141. The FCRA provides that if Defendant Experian conducts its reinvestigation of disputed information and confirms that the information is, in fact, inaccurate or it is unable to otherwise verify the accuracy of the disputed information, it is required to delete the item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

142. Plaintiff initiated a dispute with Defendant Experian and disputed inaccurate information reporting in his credit file and requested that Defendant Experian correct and/or delete the inaccurate, misleading, and highly damaging information belonging to an unrelated consumer.

143. Defendant Experian failed to respond to Plaintiff's dispute and conducted *no* investigation of Plaintiff's dispute, or such investigation, if any, was so unreasonable as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

144. Defendant Experian violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the

disputed information, before the end of the 30-day period beginning on the date on which it received notice of Plaintiff's dispute; and by failing to maintain reasonable procedures with which to filter and verify information in Plaintiff's credit files.

145.  As a result of Defendant Experian's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

146.  Defendant Experian's conduct, actions, and inactions was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively,

Defendant Experian was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

147.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT III**
**15 U.S.C. § 1681s-2(b)**
**Failure to Conduct an Investigation of the Disputed Information and Review all Relevant Information Provided by the Consumer**
**(Only Claim for Relief Against Defendant Affirm)**

148.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

149.   Defendant Affirm furnished the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Experian.

150.   Defendant Affirm violated 15 U.S.C. § 1681s-2(b) by failing to investigate Plaintiff's dispute, or otherwise by failing to fully and properly investigate Plaintiff's dispute(s), including but not limited to failing to review all relevant information regarding the same; by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Experian; and, by failing to cease furnishing inaccurate information

relating to Plaintiff to the national credit bureaus, including but not limited to Experian.

151.  As a result of Defendant Affirm's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

152.  Defendant Affirm's conduct, action, and inaction were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

153.  Plaintiff is entitled to recover attorneys' fees and costs from Defendant Affirm in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.   Determining that Defendants negligently and/or willfully violated the FCRA;

ii.   Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.   Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.   Granting further relief, in law or equity, as this Court may deem appropriate and just.

### DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 30th day of April 2024

**CONSUMER ATTORNEYS**

*/s/ Catherine Tillman*
Catherine Tillman, Esq., FL #0057663
CONSUMER ATTORNEYS
8245 N. 85th Way
Scottsdale, AZ 85258
T: (941) 263-7310
F: (718) 715-1750
E: ctillman@consumerattorneys.com

*Attorneys for Plaintiffs,*
*George D. Milanes*